*Exhibit A*

**Page 23**

1    THE COURT: Call your next witness.
2    MR. McPHILLIPS: Jerry Stinson.
3         J E R R Y   S T I N S O N,
4    the witness herein, having first been duly sworn
5  or affirmed to tell the truth, was examined and testified as
6  follows:
7              DIRECT EXAMINATION
8         BY MR. McPHILLIPS OF JERRY STINSON:
9    MR. BROWN: Your Honor, before the witness
10 testifies, may I be heard before the witness begins his
11 testimony?
12   THE COURT: Yes.
13   MR. BROWN: The United States anticipates that
14 the testimony that --
15   THE COURT: You need to speak into that mic,
16 though, so you're recorded.
17   MR. BROWN: Yes, ma'am.
18       The United States anticipates the testimony that
19 Mr. Stinson is about to give is subjecting himself to
20 perjury and/or one thousand and one charges. He probably
21 should be reminded of his rights not to incriminate
22 himself.
23   THE COURT: Thank you very much. The Court will
24 do that.
25   MR. BROWN: And to follow up on that, that that

**Page 24**

1  taking of or declining to incriminate yourself applies to
2  the whole testimony and not portions of it. So he should
3  be able to understand that, as well.
4    THE COURT: Mr. McPhillips?
5    MR. McPHILLIPS: Thank you, Your Honor.
6        If I may say so, most respectfully while what he
7  may have said may be legally technically correct, it also
8  serves as having a very intimidating effect on this witness
9  in terms of --
10   THE COURT: This Court is going to remove any
11 intimidating effect right now by speaking directly to Mr.
12 Stinson.
13       How are you, sir?
14   THE WITNESS: Doing fine.
15   THE COURT: I want you to speak directly into
16 that mic, and I want you to be aware that you have been
17 subpoenaed to attend this hearing. Your testimony is being
18 given under oath. This is a public proceeding. The oath
19 that has been administered to you requires you to do one
20 thing only: To answer truthfully each and every question
21 that's asked of you.
22       The United States' Attorney has represented to
23 the Court its belief that you may give some testimony that
24 can be used by the United States to bring a different kind
25 of prosecution against you. In other words, there is some

**Page 25**

1  concern that you might perjure yourself. The Court is
2  required just to remind you of your constitutional rights
3  at this juncture. You are protected as a citizen of the
4  United States against self-incrimination. All that means
5  is you cannot be forced to give testimony against yourself.
6  You can't be forced to help the Government make a criminal
7  case against you.
8        Now as long as you testify truthfully, you really
9  need not even be worried about that. But this Court needs
10 to remind you that if at any juncture you feel the need to
11 confer with a lawyer or to decline to answer a question
12 because you fear that answering the question might suggest
13 some improper activities on your behalf, you have that
14 right to do so. But neither Mr. McPhillips who subpoenaed
15 you, nor the United States is making any effort to
16 intimidate you from doing what you have the obligation to
17 do now; that is, to answer truthfully as a sworn witness
18 questions that are going to be asked of you by both
19 lawyers. Do you understand?
20   THE WITNESS: Yes, ma'am.
21   THE COURT: All right. Do you wish to proceed
22 now with your testimony?
23   THE WITNESS: Yes, ma'am.
24   THE COURT: All right. Then all I'll ask you to
25 do is move your chair up a little bit.

Page 26

1   Try not to talk while a lawyer is talking. The
2 court reporter here can only hear and record accurately one
3 person speaking at a time. So you will be asked questions.
4 Your obligation is only to respond to the question asked.
5 So wait until it's asked and you respond.
6   All right, sir.
7   Proceed, Mr. McPhillips.
8   MR. MCPHILLIPS: Yes.
9 Q. Mr. Stinson, first of all, would you just identify
10 yourself in terms of both your name and your age and your
11 race and gender, sir.
12 A. My name is Jerry Stinson. I'm thirty-three years old.
13 I'm a black male.
14 Q. Thank you, sir.
15   And, Mr. Stinson, I'd like to show you what has
16 been premarked as defendant's exhibit twelve and show it to
17 you and ask you first of all, sir, if that is your
18 signature on the back page that's notarized in front of a
19 notary public.
20 A. Yes, sir.
21 Q. Okay. And paragraph seven says, "I swear affirm that
22 I've carefully read the foregoing, and that I understand
23 its contents and the statements above are true and
24 correct." Is that so, sir?
25 A. That's correct.

Page 27

1 Q. All right. Now if we could flash back to paragraph one
2 -- I mean paragraph two. It says, "I came of my own choice
3 to make the statement about what happened to me." Is that
4 correct, sir?
5 A. That's correct.
6 Q. And tell me why you made of your own choice and your
7 own free will as you said in paragraph one to make this
8 statement.
9 A. The reason I came forward was because of the statement
10 that I told them first that I didn't pay Tyrone any money,
11 that was true. But they said they had a warrant for my
12 arrest, that they really didn't have. And they scared me,
13 and I was scared of losing my job in the process of that.
14 And that's why I made that statement, saying that I paid
15 Tyrone, but it wasn't true, though.
16 Q. And you say you were scared. What were you scared
17 of?
18 A. I was scared of losing my job. I work for E. L. Spencer
19 Lumber.
20   THE COURT: Did you say Spencer Lumber?
21   THE WITNESS: That's correct.
22 Q. And that's reflected, sir, is it not, in paragraph two?
23 You've got the captain video in the front of you there.
24 A. That's correct.
25 Q. All right. Now you mentioned in paragraph three that

Page 28

1 you had been arrested on a prior occasion and charged with
2 driving recklessly on a suspended license for resisting
3 arrest or having a firearm without a permit. That you had
4 gone to Auburn Municipal Court on these charges on April 1,
5 is that correct, sir?
6 A. That's correct.
7 Q. And you also stated that the judge gave you a suspended
8 sentence, but because your boss, Mr. Spencer told the judge
9 that you were a good worker, he did not think you should
10 spend time in jail, you ended up just having to pay a fine
11 in installments, is that correct?
12 A. That's correct.
13 Q. Okay. Now if we can move up to paragraph four.
14   Now here you refer to the Auburn police
15 contacting you and took your statement. You said they put
16 you in a room and asked you if you knew Tyrone White, is
17 that correct?
18 A. That's right.
19   THE COURT: Mr. McPhillips, let me interrupt you
20 for just a second to make sure the gentleman who just
21 walked in is not a witness.
22   (Whereupon said unidentified spectator
23 indicated.)
24   THE COURT: All right, is he not. You may
25 proceed.

Page 29

1 Q. All right. So you confirmed, did you not, that you
2 knew Tyrone White from seeing him around town because he's
3 a police officer, is that right?
4 A. That's correct.
5 Q. And then what else did you tell them?
6 A. I told them that I never had did it with Tyrone. - I
7 never talked to Tyrone about no tickets, nothing. But they
8 -- I mean they didn't want to hear that, and I told them
9 that my employer, E. L. Spencer, talked to Judge Bailey and
10 told Judge Bailey that I was a good worker, I was reliable,
11 I had been with him for eight years and he didn't want to
12 see me do any jail time.
13 Q. And that's reflected, of course, in the fourth
14 paragraph, I think, of your affidavit.
15   And moving on, sir, to paragraph five -- or the
16 top of page two, the bottom of the fourth paragraph, did
17 the police have anything ready for you to sign, sir?
18 A. Yes. I saw on the desk when they took me in the room
19 there, I saw a subpoena paper already with my name on it.
20 Q. Did they say what you needed to do concerning that
21 statement?
22 A. Yeah. They said I would have to sign it.
23 Q. And did they tell you what would happened to you if you
24 didn't sign the statement?
25 A. They were saying they would have like a warrant for my

Page 30

1 arrest. That's what they said. And there wasn't a warrant.
2 Right now they don't have a warrant for my arrest.
3 Q. So did you want to go to jail, sir?
4 A. No, sir.
5 Q. Did you -- Were you afraid of losing your job if you
6 didn't sign that?
7 A. Exactly.
8 Q. So did you sign the papers as you stated in the
9 affidavit?
10 A. Yes, sir.
11 Q. Okay. Did you have occasion on two days later, sir, as
12 reflected in paragraph five to call the police department
13 back?
14 A. I called them back on a Sunday. I even went by Willie
15 James' house, but he wasn't at home.
16    THE COURT: You went by whose house?
17    THE WITNESS: Officer Smith.
18    THE COURT: All right.
19 A. I couldn't get in touch with him, so I called the F. B.
20 I., Calvin King, and I left a message on his answering
21 machine and told him that the statement that I had made two
22 days before that wasn't true. I was scared. They
23 intimidated me for it and I didn't want to go to jail, and I
24 told him the statement wasn't true that I made.
25 Q. Did they tell you what would happen if you changed your

Page 31

1 story?
2 A. Yeah. They told me, "Jerry, don't get yourself jammed
3 up." They told me I would "get jammed up" if I changed my
4 story.
5 Q. Did they indicate to you whether you might go back to
6 jail?
7 A. I'm pretty sure they did, but I didn't see a warrant at
8 that time because they came by my house but I knew they
9 still had the warrant.
10 Q. As reflected at the bottom part of paragraph five, sir,
11 you said, "The Auburn police put the pressure back on me
12 because they wanted me to stick to the statement they
13 pressured me into signing two days earlier." You said you
14 got nervous and backed off?
15 A. I got nervous and backed off again.
16 Q. Okay. Now -- And in paragraph six you say that you
17 swear that you never had any dealings with Tyrone White,
18 although you know him from seeing around but you had never
19 spoken to him as of that time, is that correct?
20 A. That's correct. I have never, ever had a conversation
21 with Tyrone. Never.
22 Q. All right. And with respect to the bottom part of that
23 paragraph where you say, "The Auburn police made me sign a
24 statement that they had already prepared for me in advance
25 but it was not true," is that --

Page 32

1 A. Yes, sir, I saw the paper on the desk.
2 Q. Is that correct, what you're saying today?
3 A. That's correct.
4 Q. And the only reason why you did sign it at the time was
5 what?
6 A. I was scared. I was frightened. I really was
7 frightened.
8 Q. Okay. Subsequently, did you get called to the grand
9 jury?
10 A. Yes, sir.
11    MR. McPHILLIPS: And, Your Honor, if we may show
12 the first exhibit is the superseding indictment.
13 Q. Are your initials J. S.?
14 A. That's correct.
15    MR. McPHILLIPS: Your Honor, we would say let the
16 record reflect that J. S. and the superseding indictment is
17 the same person is on the witness stand here today.
18 Q. And, so, with respect to count one, the statement that
19 you -- that Tyrone White did knowingly, willfully and
20 unlawfully affect and attempt to affect interstate
21 commerce, et cetera, by unlawfully obtaining United States
22 currency not due him or his office from you, if in fact
23 that J. S. is you, would that be correct, sir?
24 A. That's correct.
25 Q. No, would it be correct that he obtained -- that you

Page 33

1 obtained -- excuse me -- that Mr. White obtained money from
2 you?
3 A. Oh, no, he didn't.
4 Q. And I know it's some official language there and I
5 didn't mean to confuse you.
6 A. Yeah.
7    THE COURT: Lawyers, remember that the court
8 reporter is diligently trying to record everything, so I
9 would remind you to remember to speak a little more slowly
10 to assist him in that connection.
11    And, Mr. Stinson, let me remind you to please wait
12 until Mr. McPhillips gets his entire question out, and that way
13 we'll have a nice, clean transcript.
14    THE WITNESS: Yes, ma'am.
15    THE COURT: Thank you.
16 Q. So it would not be true, as you stated just a moment
17 ago, what's stated in this count one of the indictment that
18 you gave any money to Mr. White?
19 A. It isn't true.
20 Q. Would it also be untrue where it states in the
21 indictment that Mr. White obtained money from you "by the
22 wrongful use of threat or fear or color of law"? Did Mr.
23 White cause you fear?
24 A. No, he didn't.
25 Q. Did he threaten you in any way?

### Page 34

1  A. No, he didn't.
2  Q. Did Mr. White do anything for you, sir, in any way?
3  A. Nothing.
4      MR. McPHILLIPS: Your Honor, we move for the
5  admission of both the affidavit of Jerry Stinson,
6  defendant's exhibit twelve, and although it's an official
7  document already on file, defendant's exhibit one which is
8  the superseding indictment.
9      THE COURT: I believe that we've already admitted
10 number twelve, haven't we?
11     COURTROOM DEPUTY CLERK: Not yet.
12     THE COURT: We haven't? Defendant's exhibit
13 twelve, the affidavit, is admitted. Though the superseding
14 indictment is a part of the general record, for purposes of
15 this hearing it is admitted as defendant's exhibit one.
16     MR. McPHILLIPS: Yes. I think that's it for me
17 right now.
18     THE COURT: Thank you very much.
19     Cross examination of Mr. Stinson?
20     MR. McPHILLIPS: Please respond to the cross
21 examination by Mr. Brown.
22     THE WITNESS: Yes, sir.
23         CROSS EXAMINATION.
24     BY MR. BROWN OF JERRY STINSON:
25 Q. Good morning, Mr. Stinson.

### Page 35

1  A. Good morning. How you doing?
2  Q. My name is Todd Brown. I'm an Assistant U. S. Attorney
3  with the U. S. Attorney's Office here in Montgomery.
4      Have we ever met before?
5  A. No, sir, I don't believe. I haven't seen you.
6  Q. All right. Who is Charlie Core?
7  A. He's a guy from Goose Hollow. He was raised up around
8  my family.
9  Q. And how, again, do you know him?
10 A. My cousin. I got a cousin and family member that live
11 in Goose Hollow, and Charlie Core been living in Goose
12 Hollow too for a long time.
13     THE COURT: Spell that last name for me, Mr.
14 Brown.
15     MR. BROWN: C-o-r-e.
16     THE COURT: He's not your cousin, he's a friend
17 every your cousin's?
18     THE WITNESS: Yes, ma'am.
19     THE COURT: And he lives in Goose Hollow?
20     THE WITNESS: Yes, ma'am.
21     THE COURT: All right. Thanks.
22 Q. How is Mr. Core related to Mr. Tyrone White?
23 A. That's his son-in-law.
24 Q. Now you had more than one occasion to speak with law
25 enforcement officers about this matter, haven't you?

### Page 36

1  A. Have I had what, now?
2  Q. Had more than one time that you talked with law
3  enforcement officers about this case that we're talking
4  with here today?
5  A. Well the F. B. I. come by my job. The Auburn City cops
6  came by my job, also.
7  Q. Do you remember July 15th of 2005?
8  A. I guess that's the time they came by my job. Officer
9  Smith and the F. B. I. came.
10 Q. But you don't know for sure when that was?
11 A. I don't know exactly what date it was, I'm not for sure
12 about that. I remember it was on a Friday.
13 Q. Now on the Friday that they came to talk to you, who
14 came?
15 A. Officer Willie James Smith and F. B. I. Kevin Kings.
16 Q. What happened on that day?
17 A. Well I was down doing some work on the yard. My
18 employer, E. L. Spencer the Third, came down. He whistled
19 at me, told me to "Come here." So I went to the warehouse
20 and he told me two guys wanted to see me.
21 Q. Did he know the two guys were law enforcement agents?
22 A. At the time I didn't know who they was.
23 Q. I'm not asking who did you know they were, but did he
24 know who they were?
25     MR. McPHILLIPS: Your Honor, we would object if

### Page 37

1  he knew what somebody else knew.
2      THE COURT: Sustained.
3  Q. Did he tell you if he knew that they were law
4  enforcement officers?
5  A. He didn't tell me. He just said two guys wanted to see
6  me.
7  Q. Did you go see them?
8  A. Yes, I did. He told me they said they just wanted to
9  talk to me.
10 Q. And is that what they did, just talk with you?
11 A. That's what I thought they was going to do.
12 Q. What did they do?
13 A. I was in the warehouse, and I thought we was going to
14 talk inside the warehouse but they proceeded outside. So I
15 followed them outside and we ended up going to the Dorango,
16 and Mr. Smith opened the back door for me and I got in the
17 back seat. But my employer, he never told me anything about
18 they was going to take me off the premises.
19 Q. All right. Now you're sure about that being a Dodge
20 Durango?
21 A. It was a Dodge Durango.
22 Q. What color was it?
23 A. It was like a dark color. Like a charcoal gray.
24 Q. And what happened after that?
25 A. We proceeded out of the lumber company and we went down

### Page 38

1  to the police department.
2  Q. What happened?
3  A. And at the same time my employer still didn't know that.
4  I was on the clock at that time, and my employer didn't even
5  know that I was gone because they told him they just wanted
6  to talk to me.
7  Q. But you don't know what your employer knew.
8  A. He told me they said they just wanted to talk to me.
9  Two guys wanted to talk to me. That's what he told me.
10 Q. But you didn't know --
11 A. I didn't know who they was, though.
12 Q. So you went in the car, and then what happened?
13 A. We left, went to the Auburn Police Department.
14 Q. What happened there?
15 A. They took me into a room. They proceeded -- They had my
16 mug shot. They said that I had charges of resisting arrest,
17 attempt to elude and stuff.
18 Q. Did you have those charges against you?
19 A. Yes, sir.
20 Q. Did you have an arrest warrant at that time?
21 A. They said they had a warrant.
22 Q. That's not my question, sir. Did you have one at that
23 time?
24 A. I never saw it.
25 Q. All right. What happened -- What did you tell them?

### Page 39

1  A. I told them my employer, E. L. Spencer, after they asked
2  me how did I get off these charges, and I told them my
3  employer was E. L. Spencer. He told Judge Bailer he didn't
4  want to see his employee doing any jail time. I had been
5  with him for eight years. He told Judge Bailey I was
6  reliable, dependable, and I was a good worker.
7  Q. Isn't it true that you told him that Tyrone White paid
8  you five hundred dollars to help with court cases?
9  A. After they told me they had a warrant for my arrest.
10 Q. So you did tell them that?
11 A. Yeah, after they wanted to hear that. After they
12 threatened they had a warrant for my arrest.
13 Q. You've got a good relationship with your boss, don't
14 you?
15 A. Yes, sir.
16 Q. In fact, you borrowed two thousand dollars from him at
17 one point in time, didn't you?
18 A. That's correct.
19 Q. And you told him that that was to pay off some court
20 fines as well, didn't you?
21 A. That's the fines I had prior to these charges, and I
22 wanted to pay those off before I went to court. And that's
23 what I did.
24        And I also told them, Officer Smith, and I told
25 the F. B. I. King that I got kids, and I gave my Mom some

### Page 40

1  money.
2  Q. Now after you spoke with them on that day, and then
3  they took you back to your job, right?
4  A. That's correct.
5  Q. Then when was it that you tried to call Lieutenant
6  Smith after that?
7  A. I called him Sunday.
8  Q. The Sunday following the Friday?
9  A. That's correct.
10 Q. Why were you calling him, again?
11 A. To tell him the statement that I had made Friday that I
12 had paid Tyrone money, that wasn't true, and I felt bad
13 about it.
14 Q. Tell me how that came about. How did you just come
15 about feeling bad about that?
16 A. Because first of all like I was telling them, my
17 employer, he did a favor for me. My employer did a favor
18 for me. And they threatened saying they had a warrant for
19 my arrest, and they frightened me with that. So that's why
20 I said, "Yeah, I paid him." I have never had anything to do
21 with Tyrone. So that's why I called him back Sunday two
22 days later.
23        And I left a message on Mr. King's cell phone. I
24 even went by the office of the police department looking
25 for Mr. Smith, but he wasn't in.

### Page 41

1  Q. And I'm going to come back to that part, but my
2  question to you was, what made you feel bad. Why did you
3  have this change of heart?
4  A. Because the statement wasn't true. It wasn't true.
5  Q. But you didn't have a problem with giving it on Friday,
6  now you had a problem sometime Saturday or Sunday it
7  started bothering you?
8  A. That's correct.
9  Q. And you're saying it's because you gave the statement
10 to begin with because you thought you had a warrant against
11 your arrest?
12 A. Yes. That's what they told me.
13 Q. So why would you lie because you had a warrant against
14 your arrest?
15 A. I didn't want to go to jail.
16 Q. So you lied to stay out of going to jail?
17 A. They scared me. Like I said, they said they had a
18 warrant for my arrest. And actually, after all of that they
19 didn't have a warrant for my arrest. Right now I don't have
20 a warrant for my arrest.
21 Q. But my question was, you lied so you wouldn't go to
22 jail?
23 A. That's correct.
24 Q. Now we're talking sometime in July when that happened,
25 is that right?

MITCHELL P. REISNER, CM, CRR - (334) 265-2500             Page 38 - Page 41
Total Computerized Litigation Support

### Page 42

1  A. That's correct.
2  Q. And then later in August, in fact on August the 3rd of
3  2005, you came to testify before a federal grand jury, is
4  that correct?
5  A. That's correct.
6  Q. How did you get here that day?
7  A. I rode down with my cousin.
8  Q. Police officers didn't drag you down here?
9  A. No. After they told me that Sunday that I talked to
10 them or that I would get jammed up, no, and this and that
11 telling me I would get jammed up.
12 Q. Well let me ask you this. Don't you think you would
13 get jammed up if you tell law enforcement something one
14 time and you tell them something else another time?
15 A. But they told me they had a warrant for my arrest but
16 they actually didn't. That's why I told them that. They
17 didn't have a warrant for my arrest.
18 Q. My question was, if you tell law enforcement something
19 one time and you tell them something else another time,
20 don't you think that that -- you could get jammed up for
21 that?
22 A. At the time, I wasn't thinking like that. I just wanted
23 the truth to come out.
24 Q. Well don't you think maybe that that's what Agent King
25 was thinking when he told you you could get jammed up if

### Page 43

1  you told law enforcement something one time and you told
2  him something different another time?
3  A. No, Officer King didn't say that.
4  Q. It was Officer --
5  A. Smith.
6  Q. So he would be accurate in saying that, right?
7  A. I guess he would.
8      MR. BROWN: Your Honor, at this time the
9  Government offers Government's exhibit A, which is the
10 grand jury transcript of Mr. Stinson.
11     THE COURT: Any objection?
12     MR. McPHILLIPS: No, Your Honor.
13     THE COURT: Admitted. Government's exhibit A is
14 admitted.
15 Q. Now on that Sunday when you talked to Agent King, you
16 weren't able to talk with Officer White, is that right?
17 A. I have never talked to Officer White.
18 Q. I'm sorry, Officer Smith.
19 A. No, sir, I wasn't able to get in touch with him.
20 Q. So you called Agent King?
21 A. I called Agent King.
22 Q. Who is with the F. B. I.?
23 A. Who is with the F. B. I.
24 Q. What kind of -- Who had a warrant against you, or who
25 were you told had a warrant against you?

### Page 44

1  A. Officer Smith told me they had a warrant for my arrest
2  at the city.
3  Q. At the city. Not a federal warrant?
4  A. Not a federal warrant.
5  Q. Now when you talked with Agent King, did you talk to
6  him directly or did you talk to him in the presence of
7  Officer Smith?
8  A. In the presence of Officer Smith.
9  Q. I'm talking about Sunday.
10 A. That Sunday? No, I left a message. When I called his
11 cell phone, it was off and I left a message on his cell
12 phone.
13 Q. With who?
14 A. Mr. King.
15 Q. Did Agent King call you back?
16 A. He didn't call me back. What happened, the next day I
17 had a vehicle problem on my Dad's truck and I was in the
18 yard working on it and that's when they pulled up.
19 Q. Both of them?
20 A. Both of them together, mm-hmm.
21 Q. Was it on that date that you were served with the grand
22 jury subpoena?
23 A. No, sir, they served that that Friday.
24 Q. Did you ever at any time pull Agent King aside and say
25 hey, I feel nervous about these Auburn police officers, the

### Page 45

1  way that they're coming up to me or the way they're
2  approaching me, or the way they're talking to me or
3  anything like that?
4  A. At the time -- They wasn't bothering me at the time.
5  Q. But they had been.
6  A. But they came by later on.
7  Q. But you indicated on Friday before this that they had
8  convinced you or coerced you into giving that statement.
9  A. That was Mr. Smith and Mr. King was inside the same room
10 that we was in. It was those two.
11 Q. Did you ever call anybody else and say these people are
12 bothering me, they're coercing me or anything like that?
13 A. They told me not to talk to nobody else about this.
14 Q. So you didn't?
15 A. That's what they told me. They said don't talk to
16 nobody about this now.
17 Q. But you did talk to somebody else about it, didn't you?
18     THE COURT: Let me interrupt you just a second.
19     Those are who are permitted to be in this
20 courtroom as spectators are also expected to abide by the
21 rules of this Court. And that is proper decorum at all
22 times. There will be no outbursts. There will be no
23 reaction that this Court or anyone else can hear through
24 any testimony. If you cannot abide by those rules you are
25 excused at this time.

Page 46

1    Proceed, Mr. Brown.
2    MR. BROWN: Thank you, Judge.
3 Q. You said that the law enforcement officers told you not
4 to talk to anyone else about this, is that correct?
5 A. That's correct.
6 Q. But you did.
7 A. Yes, sir, later on.
8 Q. You actually did on the day that you came down for
9 grand jury on August 3rd of 2005, isn't that right?
10 A. Excuse me, I didn't understand that now.
11 Q. Did you talk to people other than law enforcement on
12 August the 3rd, 2005?
13 A. I talked to a lot of people that was down here.
14 Q. Did you talk to a person by the name of Louis
15 Franklin?
16 A. I don't know Louis Franklin.
17 Q. How about an individual who -- Who questioned you at
18 the grand jury in this case?
19 A. I don't remember his name either.
20 Q. All right. But you talked to that person before you
21 went into the grand jury, is that right?
22 A. I don't know who you're talking about.
23 Q. You didn't talk to the person who asked you questions
24 before you went into the grand jury? You never met him
25 before in your life?

Page 47

1 A. Oh yes, Willie James. I talked to Willie James Smith.
2 Q. Someone asked you questions in the grand jury, is that
3 correct?
4 A. That's correct.
5 Q. A prosecutor?
6 A. That's correct.
7 Q. And you talked to him before you went into the grand
8 jury?
9 A. That's correct.
10 Q. Did you ever at any time pull him aside and say hey, I
11 don't want to do this, these people are forcing me to do
12 this, threatening to put me in jail?
13 A. At that time I didn't understand that. I didn't
14 understand the law. I didn't understand that at that time.
15 Q. So you didn't pull him aside and tell him that?
16 A. I didn't. I didn't know if I could do that or not at
17 the time.
18 Q. I'm going to show you what is page three of the grand
19 jury testimony at line nineteen. Do you see that?
20 A. Line nineteen.
21 Q. You may not have the lines on yours. Let me back that
22 up. Do you see it now?
23 A. What, that letter A beside it?
24 Q. Yes. That's your answer there where you say you're at
25 a funeral gathering the night before a funeral, and there

Page 48

1 was an altercation and you got a pistol from somebody that
2 was there. Is that accurate? Did that happen?
3 A. That's correct.
4 Q. And then it says behind -- on the way home the police
5 got behind you, and I'll flip to page four, and it says the
6 police got behind you and you were panicked because you
7 didn't have a license or insurance and you had that pistol
8 with you.
9 A. That's correct.
10 Q. And that's a correct statement?
11 A. That's correct.
12 Q. You agree with that.
13    Then at line ten, a little bit further down it
14 says that you didn't have that permit, and you got caught
15 with a pistol that wasn't yours and you were trying to do
16 the right thing, is that correct?
17 A. That's correct.
18 Q. And you agree with that statement?
19 A. That's correct. I was scared at the time because I
20 didn't know. Like I said, I took a pistol off a guy and he
21 was swinging it around during that funeral gathering so I
22 got it from him for everybody else's protection.
23 Q. And later on at line seventeen there, you say that you
24 were fleeing, you were attempting to elude and carrying a
25 pistol without a permit, resisting arrest and driving with

Page 49

1 a suspended license. That's what kind of traffic citations
2 that you told the grand jury that you were cited for, is
3 that correct?
4 A. That's correct.
5 Q. And you agree with that statement?
6 A. That's correct.
7 Q. Then at the bottom at line twenty-three through
8 twenty-five, it says that after you were charged, there was
9 a time that you had a conversation with or met with an
10 officer by the name of Tyrone White. That was the question
11 that was given to you, is that right?
12 A. That's correct.
13 Q. And your answer was, "After those charges, I did."
14 A. Yes, sir.
15 Q. That was your answer.
16 A. After they threatened to lock me up.
17 Q. That's not my question. That was your answer?
18 A. That's correct.
19 Q. You agree with that statement now?
20 A. Yes, sir.
21 Q. So you did talk with Officer White at some point in
22 time, is that correct?
23 A. I was scared. That's what I told them.
24    THE COURT: Mr. Stinson, be sure you're listening
25 to the question from Mr. Brown. His question to you was,

Page 50

1  is it correct that you said after those charges I did meet
2  with Officer White?
3      THE WITNESS: That's correct.
4      THE COURT: Now what is correct, that you met
5  with him?
6      THE WITNESS: That's what I told them.
7      THE COURT: That's what you told the grand jury.
8  But his second question, if I'm correct, Mr. Brown, is did
9  you in fact meet with Mr. White as you told the grand jury?
10     THE WITNESS: I told them I did.
11 Q. My question is, did you in fact meet with Mr. White?
12 A. Did I in fact meet with Mr. White?
13 Q. Yes.
14 A. I didn't. I never meet with Mr. White. I never met
15 with him.
16 Q. So we're at a point right now in your grand jury
17 testimony where you've agreed that everything that you've
18 said is true up to this point and now you're saying this is
19 untrue?
20 A. At the time at the grand jury, like I said, I didn't
21 know if I could change my story. That's why I called Mr.
22 King back that Sunday.
23 Q. You agree that this is not the truth?
24 A. That's not the truth.
25 Q. Okay. Then you were asked did you know Officer White

Page 51

1  before you talked to him about these charges. Did you know
2  -- That's the question. You said yes, you did.
3  A. I knew him -- I knew him from being a cop. I knew him
4  by being an officer.
5  Q. And then you also knew him from some other way, didn't
6  you? Line six.
7  A. I know him by being Charlie Core's son-in-law.
8  Q. All right. And you told the grand jury that you knew
9  him from Charlie Core, and that's his, that would be Tyrone
10 White's, father-in-law.
11 A. That's correct.
12 Q. And do you agree with that statement?
13 A. I agree with that.
14 Q. And you also say Charlie Core is more like, just like a
15 family member to you. Is that correct?
16 A. That's correct.
17 Q. And you agree with that statement?
18 A. That's correct.
19 Q. And on line -- or page ten, line thirteen, I want you
20 to look at that for a moment. Can you see that?
21 A. Line ten?
22 Q. Line thirteen.
23 A. Line thirteen.
24     THE COURT: Page ten, line thirteen.
25 Q. Do you see that paragraph beginning right here?

Page 52

1      THE COURT: Read the beginning.
2  Q. It says, "He was more like -- just like a -- close to a
3  family. Like I said, Charlie is like a father figure to me
4  and that is his father-in-law also."
5  A. Yes. That's Tyrone's father-in-law.
6  Q. All right. So Charlie is like a father figure to you,
7  and Tyrone's father-in-law is Charlie, sort of makes y'all
8  like brothers, doesn't it?
9  A. No, it don't.
10 Q. All right. After you talked about Charlie Core
11 starting back at line twelve, do you see that question
12 there? "Did there come a time when you actually discussed
13 helping you with your situation? And when I say
14 'situation,' I mean these misdemeanors that you have been
15 charged with, attempting to elude, fleeing, the pistol and
16 the other charge."
17     MR. MCPHILLIPS: What page are you referring to?
18     MR. BROWN: Page five starting at line twelve
19 through sixteen.
20 A. No, I didn't.
21 Q. You didn't say that to the grand jury, is that what
22 you're saying? That was a question asked to you at the
23 grand jury.
24     THE COURT: For clarity of the record, let's read
25 the question into the record and his answer. And then let

Page 53

1  him read his answer and then you ask the question if that
2  is what he said to the grand jury.
3  Q. I'll read it to you again, Mr. Stinson.
4      THE COURT: And so that we follow, are we at page
5  five, lines twelve through sixteen?
6      MR. BROWN: Yes, ma'am.
7      THE COURT: All right. Read the question.
8  Q. During the course of the grand jury did you -- weren't
9  you asked the question, "Did there come a time when you all
10 actually discussed him helping with your situation? And
11 when I say "situation" I mean these misdemeanors that you
12 have been charged with, attempting to elude, fleeing, the
13 pistol and other charge? I can't remember which one."
14     And your answer was, "Resisting arrest." Is that
15 what you stated to those questions?
16 A. That's correct.
17 Q. And do you agree with what is stated in that part of
18 the transcript?
19 A. Ask that question again. I'm looking at this right
20 here.
21 Q. Do you agree now that that's the truth?
22 A. I never discussed that with him.
23 Q. So this is not the truth?
24 A. That's not the truth.
25 Q. Then at line twenty-one through twenty-four you tell

**MITCHELL P. REISNER, CM, CRR - (334) 265-2500**
**Total Computerized Litigation Support**

Page 50 - Page 53

Page 54

1  Mr. Franklin, who is asking you the questions, that "Yes,
2  sir, I, as a matter of fact, he came by the job one day
3  and, well, not directly by the job, he passed it. He
4  didn't come in and I stopped and talked to him about it."
5  A. That wasn't true.
6  Q. But you said it?
7  A. I said it.
8  Q. And Mr. Franklin at the end of that page line
9  twenty-five asked you, "So did you flag him down?" And
10 your response was to the grand jury, "Yes, sir, and I was
11 telling him, you know, the trouble that I got in." Is that
12 what happened in the grand jury?
13 A. That's what I told him, but it wasn't true.
14 Q. Then line four you continue and you say, "I asked him,
15 you know, if he could help me out. I didn't -- didn't know
16 that it would lead to this right here. I thought maybe he
17 could just talk to the arresting officer, but he told me it
18 would, you know, cost me some money. You know." Is that
19 what you told the grand jury?
20 A. Yes, sir, I did.
21 Q. Do you agree with that now?
22 A. I don't agree with it now.
23 Q. Starting at line twelve. You answer a question by
24 saying, "As a matter of fact, he was riding the bike,
25 that's what they -- they patrol on, bike." And that was to

Page 55

1  clear up Mr. Franklin's question, is that correct?
2  A. That's a statement I had made, but it wasn't true.
3  Q. Then at line eighteen you say, "They ride bikes up in
4  Auburn." What did you mean by that?
5  A. There are cops riding bike. They have different cops
6  riding bike.
7  Q. And is Officer White an officer that would ride a
8  bike?
9  A. He was a bike rider at one time.
10 Q. So is that a correct statement? Are you telling the
11 truth to the grand jury now?
12 A. Yes, that's true about he used to ride a bike. That was
13 true.
14 Q. And then line twenty-two you say, "I knew Tyrone, you
15 know, yeah." Is that correct?
16 A. Yes, sir, I knew Tyrone. I knew him, but never had a
17 conversation with him.
18 Q. Never had talked to him?
19 A. Never talked to him.
20 Q. And then again on line twenty-five on page six you
21 state, or the question is asked to you, "Did ask you him
22 for help, or did you ask him --" And I'm going to flip to
23 page seven "-- what you needed to do, tell us how the idea
24 that somehow if you gave him money he could help you with
25 your legal troubles." Do you remember him asking you

Page 56

1  that?
2  A. That wasn't true. None of that wasn't true.
3  Q. That's not what I'm asking. Do you remember him asking
4  you that question?
5       THE COURT: Hold on just a second. Let me
6  ascertain if the gentleman who just came is not a witness?
7       UNIDENTIFIED MALE SPEAKER: No, ma'am.
8       THE COURT: Okay. Thank you very much.
9       Proceed, Mr. Brown.
10 Q. Do you remember that question being asked to you in the
11 grand jury? Do you need me to go back --
12 A. I don't remember him asking me that in the grand jury.
13 Q. But your answer to that question was, "Okay, when I
14 went to him and asked him like I said, I didn't think it
15 was going to take money, I thought maybe he could talk to
16 the arresting officer in that way, you know, we could get
17 together and maybe drop some of the charges and just keep
18 me from going to jail. But he told me I would have to pay
19 some money." Do you remember that answer?
20 A. I remember giving that answer, but that wasn't true.
21      THE COURT: Mr. Brown, remember to approach that mic
22 for the court reporter's sake.
23      MR. BROWN: I apologize, Your Honor.
24 Q. Then Mr. Franklin asked you, "How much did he tell you
25 you would have to pay?"

Page 57

1       And you answered, "He told me since I know you,
2  it would only take five hundred dollars. Five hundred
3  dollars." Do you remember that?
4  A. I remember him saying that, but it wasn't true. None of
5  this wasn't true.
6       Can I say something also?
7  Q. Yes. But you can answer my questions, Mr. Stinson?
8  A. Okay.
9  Q. Now you had said earlier that you didn't know you could
10 change your story or anything like that. Do you remember
11 saying that?
12 A. That's correct.
13 Q. All right. I want you to look at page fifteen, line
14 seventeen. Mr. Franklin there asked you, "Is there
15 anything you want to add, you know, or anything you want to
16 correct at this time?"
17      And your statement was, "No, all I want to say
18 again is I made a mistake, like I said, from the start from
19 point one."
20 A. At that time I didn't know I could change my
21 statement.
22 Q. You don't agree with me that at line seventeen Mr.
23 Franklin tells you that you can add or correct anything to
24 your statement at this time?
25 A. I agree with you on that, but I didn't know at the time

MITCHELL P. REISNER, CM, CRR - (334) 265-2500          Page 54 - Page 57
Total Computerized Litigation Support

Page 58

1 that I could tell him that the statement that I had made was
2 false.
3 Q. And then -- But your answer to that was, instead of
4 saying you know Mr. Franklin, I thought about it, I tried
5 to call the police officers this past weekend and tell them
6 about it, I just don't feel comfortable doing this.
7 A. At the time I didn't know I could do that.
8 Q. But you didn't do it?
9 A. I didn't know I could do it. I did not know.
10 Q. And you didn't tell him that, you know, I've given some
11 testimony here before this grand jury under oath, and I
12 just did it because I was scared to go to jail?
13 A. I was scared to go to jail. That's why I did it.
14 Q. But you didn't tell Mr. Franklin that.
15 A. I didn't know I could tell him that at that time.
16 Q. Did you tell Mr. Franklin that?
17 A. No, sir, I didn't tell him.
18 Q. Did you tell the grand jury that?
19 A. No, sir, I didn't.
20 Q. And then you say -- But instead of saying that, you
21 say, "I made a mistake, like I said from the start at point
22 one, and I made another mistake by paying. And like I
23 said, he still -- I didn't see anything he had done for me
24 really, I just made a bad judgment." You made that
25 statement.

Page 59

1 A. I made that statement.
2 Q. Rather than telling Mr. Franklin and the grand jury
3 that you felt like you were pressured into doing it?
4 A. At the time I didn't know I could tell him. That's why
5 I called Officer King back that Sunday.
6 Q. Well you saw Special Agent King when you came to the
7 grand jury, isn't that correct?
8 A. I didn't see Mr. King.
9 Q. Did you see any other F. B. I. agents there?
10 A. Yes, sir, I did. But I didn't talk to anybody from the
11 F. B. I., so I figured I shouldn't have been talking to Mr.
12 King. And at the time, like I said, I didn't know if I
13 could do it at that time.
14 Q. You didn't know if you could talk to the F. B. I.?
15 A. I didn't know that I could tell them if my story was
16 false. I didn't know I could do that.
17 Q. Did you have any other conversations with him that
18 day?
19 A. No, I didn't.
20 Q. Did you have any other conversations with Auburn police
21 officers on the day that you went to the grand jury?
22 A. Excuse me now?
23 Q. On the day you went to the grand jury, did you talk to
24 any Auburn police officers?
25 A. I talked to Mr. Smith.

Page 60

1 Q. Did you talk to any F. B. I. agents that day?
2 A. Yes, I did.
3 Q. Do you recall who they were?
4 A. I can't remember his name.
5 Q. Do you see him in the courtroom today?
6 A. Yes, sir.
7 Q. Would you point him out for me.
8     (Whereupon, the witness indicated.)
9 A. The guy right there.
10 Q. What's he wearing?
11 A. The sunglasses that's hanging down.
12 Q. The glasses on his nose?
13 A. Yes, sir.
14     MR. BROWN: Let the record reflect that Mr.
15 Stinson is pointing out Special Agent Paul Houston.
16 Q. Do you know him by that name?
17 A. I can't remember his name.
18 Q. But you knew he was an F. B. I. agent?
19 A. And I remember his face.
20 Q. And you knew he was an F. B. I. agent?
21 A. I knew he was an F. B. I. agent.
22     THE COURT: I'm sorry, is he identifying him as an
23 agent he saw at the grand jury, or at some other time?
24 Q. When do you remember seeing him?
25 A. I remember seeing him at the grand jury.

Page 61

1 Q. And that was on August 3rd, 2005.
2     Have you ever seen Agent Houston before that
3 day.
4 A. No, sir.
5 Q. Did you ever pull Agent Houston aside and say look, I
6 need to talk to you about something bad that's going on
7 with the Auburn Police Department?
8 A. At that time, I just told you, I didn't know if I could
9 do that at that time. I didn't know.
10 Q. But you knew you could talk to him, right?
11 A. I knew I could talk to him, but I didn't know if I could
12 talk to him about that.
13 Q. Well let me ask you a question. Where did you eat
14 lunch that day?
15 A. They told me, "Let's go out to a restaurant." We went
16 to a restaurant down the street there somewhere.
17 Q. So you went to lunch with him that day?
18 A. They told us to come on and go to lunch with them.
19 Q. Did they invite you to go to lunch?
20 A. They said, "Come on, let's go to lunch." I mean I
21 didn't know if anything was wrong with it or not.
22 Q. But you went with them?
23     THE COURT: Went with whom? Who are we talking
24 about?
25 Q. Special Agent Houston, is that correct?

**MITCHELL P. REISNER, CM, CRR - (334) 265-2500**
**Total Computerized Litigation Support**

Page 58 - Page 61

Page 62

1  A. Who is Houston? I don't know Houston.
2  Q. The gentleman that's sitting at the end of the table.
3  A. Oh, that's his name?
4  Q. Right?
5  A. Yes.
6     THE COURT: Is that the person you went to lunch
7  with?
8     THE WITNESS: I went with my cousin. I didn't
9  just actually go with him. We all went. Some more people
10 that was testifying went, too.
11 Q. Okay. Who all went to lunch that day?
12 A. All I remember is the face, Willie Smith, and I guess
13 Mr. Houston.
14 Q. Okay. But this gentleman here went to lunch with
15 you?
16 A. Yeah, he went.
17 Q. And you say your cousin went?
18 A. We all went. Mr. Smith, him, some other people went I
19 don't know who they was.
20 Q. Who were the people that were there that you knew?
21 A. Mr. Smith is the only one I really knew. I didn't know
22 the rest of them.
23    THE COURT: Are you referring to the police
24 officer, Smith?
25    THE WITNESS: That's correct. Mr. Smith, the

Page 63

1  police officer.
2     THE COURT: What was the name of your cousin
3  you're referring to?
4     THE WITNESS: Mitchell. Mitchell Giles. He was
5  also there.
6  Q. Who paid for your lunch that day?
7     MR. McPHILLIPS: Your Honor, I have been holding
8  back, but I don't know the relevance of who he was having
9  lunch with.
10    THE COURT: I'm going to allow it. Overruled.
11 Go on.
12 A. I didn't eat lunch.
13 Q. You didn't eat lunch?
14 A. I didn't eat lunch.
15 Q. Did you get something to drink?
16 A. I didn't get nothing.
17 Q. You just sat there?
18 A. I sat there.
19 Q. Didn't talk about anything?
20 A. Nothing.
21 Q. But you clearly did not tell anyone there that you had
22 been threatened with jail time for your testimony?
23 A. Mr. Smith knew it, but I didn't know if I could tell
24 anybody if Mr. Smith, he knew it.
25    MR. BROWN: If I could have a minute, Judge?

Page 64

1     THE COURT: All right.
2     (Whereupon, Mr. Brown examined various
3  documents.)
4     THE COURT: I'd like to complete this witness
5  before we take a break.
6     MR. McPHILLIPS: I've got a little follow-up, if
7  you'll let me do that.
8     THE COURT: I'll allow a brief redirect after Mr.
9  Brown has concluded, and while he is conferring, Mr.
10 McPhillips, I'm going to be asking you how many more
11 witnesses you have. I need to know how to schedule the
12 rest of this day. And I'll ask Mr. Brown the same. We
13 need to get a handle on how long this hearing is going to
14 take so that any necessary changes in the Court's schedule
15 can be made. So you can be conferring about your witness
16 list while he is doing that.
17    MR. BROWN: Just a few more questions, Your
18 Honor, and then we'll be done.
19    THE COURT: Thank you.
20 Q. Now, Mr. Stinson, you said that you knew Officer Smith,
21 is that right?
22 A. That's correct.
23 Q. How long have you known Officer Smith?
24 A. I've been knowing him for awhile. I don't know how
25 long.

Page 65

1  Q. Ten years?
2  A. Maybe ten years or longer. A little bit longer.
3  Q. Maybe fifteen years?
4  A. Maybe fifteen at the most.
5  Q. How do you know Officer Smith?
6  A. I know his Mom.
7  Q. Is it true you grew up around his family?
8  A. That's correct.
9  Q. And you've known him for about fifteen years?
10 A. That's correct.
11 Q. And you're saying that you couldn't pull him aside and
12 tell him look, man, why are you doing this to me? I can't
13 do this.
14 A. Honestly, I didn't think he would do nothing like that
15 from the start, and that's why, like I said, I called him
16 back. I even went by his house and I went by the police
17 department.
18 Q. Did you go to his Mom's house?
19 A. He don't live with his Mom.
20 Q. Still you knew his Mom, did you go over there and say
21 hey, your son is putting me in a bad spot, I need to get
22 out of this?
23 A. When I talked to him that Monday they came by, that's
24 what I told them. But they didn't want to hear that.
25 Q. But you didn't go to his Mom and tell her that.

MITCHELL P. REISNER, CM, CRR - (334) 265-2500       Page 62 - Page 65
**Total Computerized Litigation Support**

Page 66

1  A. I went by his house and I went by the police department.
2     THE COURT: Did you ever go to his mother to talk
3  with his mother?
4     THE WITNESS: No, ma'am.
5  Q. Now, you say in your affidavit that you were given a
6  statement to sign. Do you remember saying that?
7  A. That's correct.
8  Q. And I think, if I heard you wrong I'm sorry, but I
9  think during your testimony you said that you were given a
10 subpoena to sign.
11 A. That's what they had, was a subpoena on the desk.
12 Q. All right. I guess what I need to find out is, what is
13 it exactly that you signed? Was it your statement or was
14 it the back of a subpoena saying I acknowledge that I got
15 the subpoena?
16 A. I signed the front. I can't remember exactly, but I
17 think I signed the front. I can't remember.
18    MR. BROWN: May I have a moment, Your Honor?
19    (Whereupon, Mr. Brown examined various documents
20 at counsel table.)
21 Q. I'm going to show you what's been marked as defendant's
22 exhibit eleven. It's already admitted into evidence. And
23 this is -- I'm just going to show the top half. If I need
24 to show more, I will. That's a subpoena that you received
25 to be here in court today, is that correct?

Page 67

1  A. That's correct.
2  Q. Does this look like the thing that you signed with
3  Officer White -- I'm sorry, Officer Smith and Agent King on
4  that day? On that Friday?
5  A. That's correct.
6  Q. Does that look like the same thing?
7  A. Yes, sir, looked like the same thing to me.
8  Q. And let me just clarify now, just to make sure that
9  I've got this right. Are you saying that -- You said that
10 you called Agent King and left a message on his phone on
11 that Sunday.
12 A. On that Sunday, that's correct.
13 Q. Did the message say -- What did the message say?
14 A. I can't recall exactly what the message said, but I told
15 Mr. King, I said, "Mr. King, this is Jerry." I said, "The
16 statement I made on Friday is not true." And I told him, "I
17 cannot do Tyrone like that because I never had any dealing
18 with Tyrone. I had never talked to him."
19 Q. You left that message on the machine?
20 A. I left that message.
21 Q. Did he call you on back that Sunday?
22 A. No. If he did, I didn't get the message, but they came
23 by the next day.
24 Q. And then one other thing. I think we moved on to
25 another subject, but I want to clarify. You went to lunch

Page 68

1  on the day of the grand jury with the two people that we
2  talked about in the room and your cousin Mitchell Giles.
3  A. That's correct.
4  Q. Were those the only three people, or were there other
5  people there?
6  A. There was other people there. I didn't know who they
7  was.
8  Q. Do you know if they were law enforcement officers?
9  A. I guess they was. I don't know.
10 Q. Mr. Stinson, you told us that you knew Officer Smith
11 for about fifteen years or so, is that right?
12 A. That's correct.
13 Q. How long have you known Charlie Core?
14 A. Probably about the same time.
15 Q. And you also had mentioned that the reason that you
16 told these lies was because you didn't want to go to jail
17 on this city warrant.
18 A. That's correct.
19 Q. How long would you have had to go to jail on that city
20 warrant?
21 A. I have no idea.
22    MR. BROWN: No further questions.
23    THE COURT: Any brief redirect?
24    MR. McPHILLIPS: Yes, ma'am. Very briefly,
25 redirect.

Page 69

1           REDIRECT EXAMINATION.
2     BY MR. McPHILLIPS OF JERRY STINSON:
3  Q. Mr. Brown was questioning you about the affidavit, sir,
4  and I'd like to ask you, sir, where did you sign that
5  affidavit when you signed it?
6  A. At the Mr. Cox's office.
7  Q. Is that an attorney in Auburn?
8  A. Yes, that's an attorney in Auburn.
9  Q. And you came there on your own, did you not?
10 A. That's correct.
11 Q. I hadn't called you, or nobody from my office had
12 called you and told you?
13 A. No, I hadn't talked to anyone.
14 Q. And you've never come to my office either, have you?
15 A. I don't even know where your office is.
16 Q. Okay. And after you signed this affidavit on October
17 the 19th, did you have occasion sometime after we filed our
18 motions in November to be recontacted by F. B. I. or Auburn
19 Police Department about what you had signed with us?
20 A. Would you mind repeating that again, now?
21 Q. After you signed this affidavit with us and a few weeks
22 had passed and when we filed a motion in court attaching
23 your affidavit to it, did you get contacted again by the
24 Auburn police or F. B. I. about it?
25 A. Yes, I did.

MITCHELL P. REISNER, CM, CRR - (334) 265-2500
Total Computerized Litigation Support

Page 66 - Page 69

| Page 70 | Page 72 |
|---|---|
| 1 Q. How many times did that happen, sir?<br>2 A. Twice.<br>3 Q. And did you fill harassed in any way when it<br>4 happened?<br>5 A. Yes, I did.<br>6 Q. Did you feel threatened, sir?<br>7 A. Yes. And the whole time they was coming to my job, my<br>8 employer. He was tired of it, too.<br>9 Q. Was it interfering with your work?<br>10 A. Yes, it was.<br>11 Q. So you got both harassed and threatened?<br>12 A. Yes.<br>13 Q. And, sir, did you ever have occasion to tell Billy<br>14 Smith that he needed to watch his back, tell Billy Smith<br>15 that he needed to watch out for himself?<br>16 A. Say that again?<br>17 Q. Do you know who Billy Smith is? The big, tall<br>18 investigator? He's in the back.<br>19       Would you stand up, Mr. Smith. He's the big tall<br>20 investigator.<br>21 A. Yeah. They asked me had I ever been threatened by Mr.<br>22 Billy Smith there.<br>23 Q. And were you ever threatened by him?<br>24 A. I was never threatened.<br>25       THE COURT: Who is "they"? Who are you referring | 1 A. Did I tell him he needed to watch his back?<br>2 Q. Yes.<br>3 A. No, I never told him that.<br>4 Q. Okay. Let me just show you the transcript, sir, of<br>5 your testimony in the grand jury. Just a couple of points<br>6 I wanted to clear up and ask you about. Page seven, lines<br>7 sixteen through nineteen. Do you see those lines?<br>8 A. What line, now?<br>9 Q. Sixteen through nineteen. Do you see where in the<br>10 grand jury you were asked, "Have you heard through the<br>11 grapevine or just scuttlebutt through the community that,<br>12 you know, if you got in trouble Officer White is somebody<br>13 you want to talk to?" Do you see that question?<br>14 A. Yes, sir, I see it.<br>15 Q. Was your answer true and correct on that day when you<br>16 said, "I had never heard it"?<br>17 A. I had never heard that.<br>18 Q. That answer was true and correct?<br>19 A. That's correct.<br>20 Q. All right. Then one other place on page ten, lines<br>21 twenty to twenty-five and the top line of the next page<br>22 where you were asked by someone at the grand jury referring<br>23 to you and Mr. White, or I guess maybe you and Mr. Core or<br>24 something, it says, "Charlie is like a father figure to<br>25 me." |

| Page 71 | Page 73 |
|---|---|
| 1 to?<br>2       THE WITNESS: Mr. Smith and Mr. King came by my<br>3 job and asked me have I ever been threatened by, I don't<br>4 know if I could use this term in the courtroom, but a big,<br>5 black guy.<br>6 Q. Did they use a negative slang term?<br>7 A. That's what they said, "A big black guy." "Have you<br>8 been threatened by a big, black guy?"<br>9       And I said, "No, I haven't been threatened by<br>10 anyone."<br>11       They said, "Had you ever been threatened by<br>12 Tyrone?"<br>13       I said, "I told you I never talked to Tyrone."<br>14       They asked had I ever been threatened by Charlie?<br>15 And I said, "I never been threatened by anyone."<br>16 Q. Did you have occasion to tell Mr. Smith at a later time<br>17 that he needed to watch out for himself?<br>18 A. Who are we talking about now?<br>19 Q. Mr. Billy Smith. After the F. B. I. and the Auburn<br>20 police came down and harassed you asking you about Mr.<br>21 Smith, did you then after that tell Mr. Smith he needed to<br>22 watch out for himself, watch his back or something like<br>23 that?<br>24 A. Mr. Smith?<br>25 Q. Yeah, the big guy. | 1       And then it says, question: "Okay, so you all<br>2 both had a mutual attachment to the same family?"<br>3       Answer: "Yeah, the same family and that's how I knew<br>4 him."<br>5       Then your question was, "Did y'all hang out<br>6 together?" And what was your answer?<br>7 A. "No, we don't hang out together."<br>8 Q. Is that answer true and correct, sir?<br>9 A. That's correct.<br>10 Q. And then the next question, "What I'm saying, did y'all<br>11 go to clubs together?"<br>12       And was your answer there, "No," sir, and is that<br>13 true and correct?<br>14 A. That's correct.<br>15 Q. Okay, I believe that's it. And did you go to church<br>16 with Mr. White?<br>17 A. No, I don't.<br>18 Q. Do you go to church with Mr. Core?<br>19 A. No, I don't.<br>20 Q. Okay. I think that's all.<br>21       THE COURT: Thank you very much.<br>22       THE WITNESS: Could I --<br>23       THE COURT: Just answer the question you're<br>24 asked.<br>25       We're done, Mr. McPhillips? |

Page 74

1 Q. Were you scared, sir, when you were at the grand
2 jury?
3 A. Very scared.
4 Q. Okay. Did any of the F. B. I. or anybody from the U.
5 S. Attorney's Office do anything to try to help alleviate
6 your fear at the grand jury?
7 A. No.
8 Q. Did they tell you that you could change your testimony
9 if it wasn't correct?
10 A. No.
11 Q. Did it appear to you that the F. B. I. or U. S.
12 Attorney's Office were working with the Auburn Police
13 Department? Did it appear to you that they were working
14 together?
15 A. I didn't know if they were working together. I mean
16 like I said, I didn't know. I didn't know if I could change
17 my story.
18      MR. McPHILLIPS: Okay. I think that's it, Your
19 Honor.
20      THE COURT: All right, thank you very much.
21 Mr. Brown, briefly?
22      MR. BROWN: Very briefly, Your Honor.
23           RECROSS EXAMINATION.
24      BY MR. BROWN OF JERRY STINSON:
25 Q. You were sworn in at the grand jury, correct?

Page 75

1 A. That's correct.
2 Q. And you just told Mr. McPhillips that you were told
3 that you had never been told that you could change your
4 story, is that right?
5 A. I didn't know I could -- excuse me?
6 Q. I'm asking the question, did Mr. McPhillips just ask
7 you whether or not you could change your story and were you
8 told that?
9 A. They never told me that.
10 Q. They never told you that. Let me refer you back to
11 page fifteen, lines seventeen and eighteen where Mr.
12 Franklin asked you, "Is there anything you want to add or
13 anything you want to correct at this time?"
14 A. I didn't know I could change that story.
15 Q. But you were told.
16 A. He didn't tell me like that. I didn't know that. I
17 didn't know I could just say, you know, this wasn't true. I
18 didn't know that.
19 Q. All right.
20 A. He did not make that clear. I did not understand
21 that.
22 Q. You didn't understand it?
23 A. I didn't understand it. That's why I was getting in
24 touch with Mr. Smith and Mr. King before I came down, to
25 tell them it wasn't true. I didn't know I could change

Page 76

1 that.
2 Q. Did you not understand that question?
3      THE COURT: All right, Mr. Brown. We've been
4 over this now. You've made that point on cross
5 examination. Anything new on recross?
6 Q. Mr. McPhillips also asked you about whether or not you
7 had -- whether you went to church with Mr. Core or Mr.
8 White. He referred you to page ten lines twenty-four and
9 twenty-five. Do you remember Mr. McPhillips asking you
10 that question?
11 A. Mm-hmm.
12 Q. And you said that you go to Mount Moriah, but I think
13 he goes to Green Chapel, I believe. Is that right?
14 A. That's correct.
15 Q. How did you know that?
16 A. I really didn't. That's why I said "I think". I wasn't
17 for sure.
18 Q. You just pulled a church out of the air? I mean I'm
19 asking how did you know -- how did you come to believe that
20 answer?
21 A. Because everybody live on that side of town, they either
22 go to the Mount Moriah or Green Chapel.
23 Q. Thank you for answering my question.
24      Now finally, was there any law enforcement
25 officers inside the grand jury.

Page 77

1 A. Mr. Smith was there.
2 Q. Mr. Smith was inside the grand jury room?
3 A. No, he wasn't in the grand jury.
4 Q. Was there any law enforcement officers inside the grand
5 jury room?
6 A. I can't recall seeing anyone.
7      THE COURT: All right. Thank you very much.
8      Mr. Stinson, the Court has just a couple of
9 questions for you, sir. You told me you were thirty-three
10 years old?
11      THE WITNESS: That's correct.
12      THE COURT: Tell me how far you went in school.
13      THE WITNESS: I graduated from Auburn High
14 School.
15      THE COURT: Auburn High School? In what year?
16      THE WITNESS: '92.
17      THE COURT: Did you receive any educational
18 training after high school graduation?
19      THE WITNESS: No, ma'am.
20      THE COURT: Any training -- Are you a military
21 veteran?
22      THE WITNESS: No, ma'am.
23      THE COURT: What is the first job you had after
24 graduating high school, sir?
25      THE WITNESS: I did a little brick masonry work,

MITCHELL P. REISNER, CM, CRR - (334) 265-2500
Total Computerized Litigation Support

Page 74 - Page 77

Page 78

1  that was it.
2      THE COURT: You work now for a lumber company for
3  about eight years?
4      THE WITNESS: That's correct.
5      THE COURT: Any other kind of employment you had?
6      THE WITNESS: No, ma'am.
7      THE COURT: You're married?
8      THE WITNESS: I'm single.
9      THE COURT: Have you ever been a plaintiff in a
10 lawsuit? That is, have you ever sued anybody?
11     THE WITNESS: No, ma'am.
12     THE COURT: Have you ever been summoned as a
13 witness in a civil lawsuit, whether it's in state or
14 federal court?
15     THE WITNESS: No, ma'am.
16     THE COURT: And before this year, did you have a
17 relationship with a lawyer? That is, did you establish
18 with any lawyer anywhere any kind of relationship to
19 provide any legal services to you?
20     THE WITNESS: Before this here?
21     THE COURT: Yes.
22     THE WITNESS: No, ma'am.
23     THE COURT: All right. Thank you very much.
24     MR. BROWN: I could ask one question, Your Honor?
25     THE COURT: Yes, sir.

Page 79

1      MR. BROWN: Very briefly.
2  Have you retained a lawyer to this date after
3  this thing, after this has happened?
4      THE WITNESS: After this has happened here?
5      MR. BROWN: Right. Do you have a lawyer now?
6      THE WITNESS: No, sir.
7      MR. BROWN: Is Mr. Cox your lawyer?
8      THE WITNESS: I had to go to him for some
9  counseling. He's not my lawyer. I just talked to him for
10 some counseling.
11     THE COURT: All right. Thank you very much.
12     THE WITNESS: Okay.
13     THE COURT: You may step down, Mr. Stinson.
14     (Whereupon the witness, Jerry Stinson, stepped
15 down from the stand.)
16     THE COURT: Mr. Stinson can now be excused?
17     MR. MCPHILLIPS: Yes, ma'am.
18     All right, lawyers. It's twelve-seven or eight
19 thereabouts. The Court needs to get a handle on how long
20 this hearing is going to take. Mr. McPhillips, how many
21 additional witnesses do you have?
22     MR. MCPHILLIPS: Your Honor, in conferring with
23 my associate, thirteen witnesses.
24     THE COURT: Give the Court your best judgment on
25 how long your direct examinations might take for those

Page 80

1  witnesses.
2      MR. MCPHILLIPS: My direct examinations for those
3  witnesses won't take too long. Maybe ten or fifteen
4  minutes apiece.
5      THE COURT: Are most of these witnesses who have
6  provided testimony to the grand jury?
7      MR. MCPHILLIPS: Two more are, and they're on the
8  indictment as being named as witnesses.
9      THE COURT: So two of the thirteen provided grand
10 jury testimony?
11     MR. MCPHILLIPS: Right. And Daniel Todd, who has
12 not given us a statement, is another -- gave grand jury
13 testimony that's listed in the indictment.
14     THE COURT: So there will be three people of the
15 thirteen who provided grand jury testimony?
16     MR. MCPHILLIPS: Right.
17     THE COURT: And you've got ten additional
18 witness?
19     MR. MCPHILLIPS: We've got nine -- we've got
20 witnesses who are -- who have given us statements that they
21 were coerced, but didn't necessarily testify at the grand
22 jury about the Auburn police. And then I've got two
23 attorneys, James Cox and Gary Black.
24     THE COURT: All right. Two attorneys.
25     MR. MCPHILLIPS: And Michelle Cobb, who is the

Page 81

1  wife of one of the grand jury testimony people.
2      THE COURT: All right. Mr. Brown, how many
3  witnesses for the United States who are not on the same
4  witness list?
5      MR. BROWN: Probably four.
6      THE COURT: All right, lawyers. The Court
7  obviously did not contemplate this hearing as one that
8  would take all day. Some arrangements are going to have to
9  be made for us to complete the hearing today. We're going
10 to take a recess until one-fifteen. One-fifteen.
11     Be sure, Mr. McPhillips, to have the witnesses
12 you expect to call within an hour and-a-half, because we're
13 going to try to go at least until three o'clock when we
14 come back with maybe only a little break, we're going to
15 try to finish this today. The Court needs to reschedule
16 some things that were set.
17     The four o'clock conference scheduled with Judge
18 Albritton may need to be rescheduled. I will put him on
19 notice that it's very unlikely that we can finish this
20 hearing before four o'clock. And I'm advised that Judge
21 Albritton needed to see only Mr. McPhillips and Highley.
22 However, I will put him on notice that we may not be ready
23 at that time.
24     So, lawyers and everyone else will be excused
25 until one-fifteen to start promptly at one-fifteen. Have

1  your witnesses in line ready to go.
2       Thank you very much.
3       (Whereupon, the luncheon recess was taken.)
4       THE COURT: You may call your next witness, Mr.
5  McPhillips.
6       MR. McPHILLIPS: Thank you, Your Honor.
7       We'd call Attorney James Cox over here from